UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALVARO HURTADO-GOMEZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ANGENIE McCLEARY; TOM BOWMAN; LAWRENCE SCHOEN; BLAINE COUNTY SHERIFF'S DEPARTMENT; BLAINE COUNTY SHERIFF GENE RAMSEY; BLAINE COUNTY JAIL SERGEANT BEAR a/k/a ROBERT DACHTLER; BLAINE COUNTY JAILER KELLEY a/k/a KELLY WHITE; BLAINE COUNTY JAILER HANSEN a/k/a STEVEN HANSEN; and BLAINE COUNTY JAILER OJEDA,<br><br>　　　　Defendants. | Case No. 1:12-cv-00606-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Pending before the Court is defendants' motion for summary judgment. The motion is fully briefed and at issue. For the reasons stated below, the Court will grant the motion as to defendants Robert Dachtler and Steven Hansen, but deny the motion as to defendant Kelly White.

# BACKGROUND

Plaintiff Alvaro Hurtado-Gomez (Hurtado) claims that while he was an inmate at the Blaine County Jail, the prison staff failed to protect him from a beating that left him with serious injuries. Much of Hurtado's original lawsuit has been dismissed, but in the remaining portion, he brings a § 1983 claim under the Eighth Amendment against three prison staff members: Robert Dachtler, Kelly White, and Steven Hansen. Dachtler was the ranking officer among the three – he was a Sergeant at the Blaine County Jail, while White and Hansen were Deputies.

Hurtado was confined in the Blaine County Jail beginning in 2011, and housed in what is known as the 500 Pod. Later, after he pled guilty to another criminal conviction, he was scheduled to be moved to the 300 Pod. In that later criminal case, he was charged with a co-defendant Rodrigo Gomez-Cruz (Gomez). Gomez was also sentenced to the Blaine County Jail, and was housed in the 300 Pod. When Hurtado saw that he was to be moved to the same Pod as Gomez, he objected on the ground that he would be in danger because Gomez felt Hurtado was a snitch.

Hurtado says he warned the staff about Gomez's threats but his warnings were ignored. Specifically, he alleges he told defendant White about Gomez's threat, and also alleges that he filed two written "kites" or requests to avoid the transfer. But he never received any response from the staff. Three days after he was moved to the 300 Pod, Hurtado was beaten by Gomez and two other inmates, sustaining serious injuries.

These three remaining defendants filed the motion for summary judgment now pending before the Court. They ask the Court to dismiss this case in its entirety.

## LEGAL STANDARDS

**Summary Judgment Standard**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). There must be a genuine dispute as to any material fact—a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

**Deliberate Indifference**

"A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1970) (internal quotation marks omitted). An official exhibits deliberate indifference when she is subjectively aware of a risk and fails to act reasonably with an understanding of the risk. *Id.* at 829. To have a valid claim, first, a plaintiff must show that he was incarcerated under conditions where the prison official could infer a substantial risk of serious harm to the plaintiff. *Id.* at 837. Next, the plaintiff must show that the prison official actually made that inference. *Id.* Finally, with the understanding of the risk, the prison official must have failed to take reasonable measures to guarantee the safety of the inmate. *Id.* at 829. When these three conditions are met, the plaintiff has demonstrated that the deliberate indifference standard is met. *See id.* at 837.

## ANALYSIS

**Defendant Deputy Dachtler**

Deputy Dachtler testified that he never received any warnings that Hurtado was in danger, and that Hurtado "never verbally expressed to me any concerns for his safety

while incarcerated." *See Dachtler Declaration (Dkt. No. 32-3)* at ¶¶ 9-20.  Hurtado confirms that he "never spoke" to Deputy Dachtler.  *See Hurtado Declaration (Dkt. No. 36-3)* at ¶ 24.

Deputy Dachtler did notice in Hurtado's file that Hurtado had spoken with detectives, and so he called the Detective who handled the case to ask if Hurtado would be providing evidence or testimony against his co-defendants.  *Dachtler Declaration, supra* at ¶ 6.  He was told Hurtado would not be providing evidence against his co-defendants.  *Id.*

There is no evidence in this record that Deputy Dachtler had actual or constructive knowledge that Hurtado was exposed to a substantial risk of harm.  *Farmer*, 511 U.S. at 829.  The Court will therefore grant Deputy Dachtler's motion for summary judgment.

**<u>Defendant Deputy White</u>**

Deputy White similarly testifies that she had no reason to believe Hurtado was in danger.  *See White Declaration (Dkt. No. 32-5)* at ¶¶ 6, 7.  She testified that the Jail has a standard protocol for receiving notice from the prosecutor for inmates who have testified against co-defendants.  *Id.* at ¶ 5.  Those inmates are given extra protection.  *Id.*  But no such notice was received regarding Hurtado.  *Id.* at ¶ 5. While Hurtado did give Deputy White a kite, she testified that Hurtado told her it was not urgent.  *Id.* at ¶ 14.  Because the kite was written in Spanish, making it impossible for her to read, Deputy White immediately passed it along to Deputy Ojeda who reads Spanish.  In summary, Deputy White testified that she "had no reason to believe that [Hurtado] was in danger" and that

Hurtado "never verbally expressed to me any concerns for his safety." *See White Declaration (Dkt. No. 32-5) at ¶¶ 6, 7.*

Hurtado recalls the conversation differently. He alleges that he pled with Deputy White to "please move me out of here" because "[m]y co-defendant is here and he thinks I am a snitch." *See Hurtado Declaration, supra,* at ¶ 13. He explained to Deputy White his "fear to be in the same place with [Gomez]," and describes his conversation with Deputy White as being about "my safety and well-being; not about my comfort." *See Hurtado Declaration, supra,* at ¶ 12.

In this summary judgment proceeding, the Court must assume the truth of Hurtado's statement. Thus, the Court assumes that Deputy White knew about Hurtado's fear that his co-defendant Gomez would harm him because he felt Hurtado was a snitch.

It is well-established that once an inmate is labeled as a snitch, he faces a substantial risk of harm. *Pinson v. Prieto,* 2014 WL 7339203 at *17 (C.D.Cal. 2014). Nevertheless, "[j]ust because a correctional officer knows an inmate has been branded a snitch . . . does not mean that an officer violates the Constitution if the inmate gets attacked." *Dale v. Poston,* 548 F.3d 563, 570 (7th Cir. 2008). Each case must be "examined individually, with particular focus on what the officer knew and how he responded." *Id.*

For example, a prison guard was not deliberately indifferent when he ignored an inmate's "vague contention that he may be attacked by a group of inmates." *See West v. Federal Bureau of Prisons,* 2012 WL 893779 at *3 (E.D.Cal. 2012). In that case, the

inmate failed "to provide any specifics such as (i) who threatened him or (ii) the content, type, and severity of the threats." *Id.*  Also insufficient were an inmate's statements to guards that other inmates were "pressuring him and asking questions." *Dale*, 548 F.3d at 569.  Similarly, an inmate failed to establish deliberate indifference when he merely "told jail officials that he was afraid and that he wanted to be moved." *Grieveson v. Anderson,* 538 F.3d 763, 776 (7th Cir.2008).

These cases demonstrate that "as the vagueness of the threat increases, the likelihood [that the prison official] has actual knowledge of impending harm decreases." *Dale,* 548 F.3d 569.  At the other end of the spectrum, an inmate's claim was found sufficiently specific when he alleged that prison officials called him a snitch in front of other inmates.  See *Valandingham v. Bojorquez,* 866 F.2d 1135, 1139 (9th Cir.1989).  There, the threat – being labeled a snitch – was express.  And the source of the threat – prison officials – established their own knowledge and enhanced the credibility of the snitch label in the eyes of the inmate population.  *Valandingham* does not purport to be the exclusive path to liability, but it does identify some important considerations in the analysis.

Here, Deputy White knew who made the threat (Gomez) and why (Gomez felt Hurtado was a snitch).  Thus, she had more specific knowledge than the officials in *Dale, Grieveson* and *West*, discussed above.  Moreover, the threat could not be dismissed as specious on its face – Hurtado had accepted a plea deal, and it was plausible that a co-defendant might assume that Hurtado snitched to get a lenient sentence.  Moreover, just

like in *Valandingham*, the source of the snitch label must be considered – there it was prison officials while here it is a co-defendant.  Those are both powerfully legitimate sources within the inmate population, raising the danger level for the inmate victim.  All of this is enough to at least put a reasonable prison official – and White herself – on inquiry notice.  Deputy White needed to follow up on the threat by making inquiries and informing others.  Indeed, she says that is the process she would follow if faced with such a threat.  *See White Declaration, supra,* at ¶ 11 ("I would put [the victim inmate] in a holding cell and speak with my supervisors to determine what action should be taken").

Assuming that Deputy White was aware of a specific threat that posed a serious danger to Hurtado, what did she do next?  She did pass along a kite she received from Hurtado. The kite was written in Spanish, a language Deputy White could not read, and she passed it along to an officer who was fluent in Spanish.  That was the extent of her follow-up to Hurtado's threats.  She never made any inquiry to investigate the credibility of the threat, and never informed anyone else of what she had heard from Hurtado.

There are substantial questions of fact raised by the conflicts in the testimony of Deputy White and Hurtado.  A reasonable juror who decides to believe Hurtado's version of the facts could find that Deputy White violated Hurtado's Eighth Amendment rights.  That is sufficient to deny summary judgment for Deputy White.

**Defendant Deputy Hansen**

Deputy Hansen testifies that Hurtado "never verbally expressed to me any concerns for his safety while incarcerated, nor did he identify any inmate that he believed

would be an imminent threat to his safety, while he had many opportunities to do so." *See Hansen Declaration (Dkt. No. 32-6)* at ¶ 8.  Deputy Hansen does allege that Hurtado told him "he wanted to move off 300 Block." *Id.* at ¶ 14.  According to Deputy Hansen, Hurtado's request was not urgent and had nothing to do with safety. *Id.*  Deputy Hansen had Hurtado fill out a kite that Hurtado wrote in Spanish, and Deputy Hansen delivered it immediately to Deputy Ojeda because Deputy Hansen could not read Spanish. *Id.* at ¶¶ 14-15.

Hurtado recalls the conversation differently.  He remembers asking Deputy Hansen, "What do you want me to do to move out of here?"  *See Hurtado Declaration, supra,* at ¶ 16.  Deputy Hansen answered, "Just remember whatever you do is going to follow you in prison," and Hurtado responded, "Yeah I know, do you want me to be in a fight to move out of here?" *Id.* at ¶ 17.  According to Hurtado, Deputy Hansen did not respond but simply took Hurtado's kite and left. *Id.* at ¶ 18.

In recalling this conversation, Hurtado explains that "I wanted to move for my safety and well-being, it had nothing to do with comfort." *Id.* at ¶ 16.  But nowhere in Hurtado's Declaration does he state that he told Deputy Hansen – as he had told Deputy Kelly – that Gomez was going to beat him because he was a snitch.  There is no indication that Hurtado explained who was threatening him or why.  Hurtado's version of the conversation – which the Court assumes is true – contains the same type of vague pleas that were found insufficient to establish deliberate indifference in *Dale, West* and

*Grieveson*. Accordingly, the Court will grant Deputy Hansen's motion for summary judgment.

## Conclusion

For the reasons above, the Court will grant the motions filed by Deputies Dachtler and Hansen, but deny the motion filed by Deputy White.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for summary judgment (docket no. 32) is GRANTED IN PART AND DENIED IN PART. It is granted as to defendants Robert Dachtler and Steven Hansen. It is denied as to defendant Kelly White.

DATED: August 31, 2015

_____
B. Lynn Winmill
Chief Judge
United States District Court